# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **DR. NIKITA Y. HARRIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **CIVIL ACTION NO.** |
| ) | **2:24-cv-01524-SGC** |
| **BOARD OF TRUSTEES OF THE** ) | |
| **UNIVERSITY OF ALABAMA,** ) | |
| ) | **JURY TRIAL DEMANDED** |
| ) | |
| **Defendant.** ) | |

## AMENDED COMPLAINT

### STATEMENT OF JURISDICTION

1.  The jurisdiction of this Court is invoked pursuant to its general original jurisdiction and under other statutory authority. This is a suit authorized and instituted pursuant to 42 U.S.C. § 2000e, et seq, known as Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

2.  This Court has original jurisdiction, pursuant to 28 U.S.C. § 1331, as this civil action arises under the laws of the United States cited above. This Court also has original jurisdiction, pursuant to 28 U.S.C. § 1343(a); as this civil action seeks to secure the protection of, and redress the deprivation of, rights secured by Title VII, providing for injunctive and other relief against discrimination.

3.  Venue is proper in this district, pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

4.  Plaintiff has fulfilled all conditions precedent to the institution of this action, as required under Title VII.

**STATEMENT OF THE PARTIES**

5.     Plaintiff Dr. Nikita Y. Harris (hereinafter referred to as "Plaintiff" or "Dr. Harris") is an African-American female. She is a resident of the State of Alabama. At all times relevant to this Complaint, Plaintiff was an employee of the named defendant.

6.     Defendant Board of Trustees of the University of Alabama (hereinafter referred to as "Defendant" or "UA") is an entity subject to suit under Title VII. At all times relevant herein, Defendant was Plaintiff's employer.

**STATEMENT OF THE FACTS**

7.     Plaintiff, Dr. Harris, is an African-American female.

8.     On or around May 12, 2016, Dr. Harris was hired by Defendant to work as an Assistant Professor in the Department of Communication Studies. Additionally, Dr. Harris served as the Program Coordinator for the Master of Arts online program. At the time of Dr. Harris' hire, Mark Nelson ("Nelson") was the Dean of the College of Communication and Information Sciences and Beth Bennett ("Bennett") was the Department Chair of Communication Studies.

9.     For the first six (6) years of her employment, everything seemed to be going well for Dr. Harris. In fact, she was promoted to the rank of Associate Professor on or around April 11, 2022. However, the following month (May, 2022), things began to change.

10.     More specifically, Darrin Griffin ("Griffin"), who was a white male, took over as Interim Chair of Dr. Harris' department. Just one (1) month after Griffin took the position, he abruptly stripped Dr. Harris of her Program Coordinator title. This came as a shock to Dr. Harris, especially because she had helped bring success to the program in terms of student growth and ranking. Notably, none of Dr. Harris' similarly situated counterparts who were outside of her protected classes were stripped of their roles with no justification.

2

11. Dr. Harris expressed her concerns about the role removal to Griffin—specifically, that this removal would negatively impact her future in the department, and she wanted to know the reason for the removal. However, Griffin failed to point to any reason—much less any legitimate reason—as to why Dr. Harris was suddenly stripped from duties she had been excelling at.

12. Just a few months later (August, 2022), Dr. Harris was made aware that this position was given to a white male—who was also much less qualified for the position than she.

13. Unfortunately, the disparate treatment did not stop at that point. Rather, during that same month, Dr. Harris found that she was also removed from the department's graduate committee with no reason or justification. Dr. Harris expressed (yet again) to Griffin that not only was she disappointed at having her roles and responsibilities unjustly removed again, but that she also felt targeted on the bases of her gender and race as a result of these actions—particularly because her similarly situated counterparts outside of her protected classes were not subject to such actions.

14. After expressing her concerns of discrimination, Griffin became visibly upset and angry at Dr. Harris and provided no legitimate response to the discriminatory actions he had taken against her. Actually at that point, Griffin began to take even more adverse actions against Dr. Harris, including but not limited to, isolating and micromanaging her (which he did not do with her similarly situated counterparts outside of her protected classes).

15. More specifically, in January, 2023, Griffin began micromanaging and unfairly critiquing Dr. Harris' teaching skills, as compared to that of her similarly situated counterparts outside of her protected classes. Griffin was now claiming that the reason for his stripping of Dr.

Harris' roles were because her Student Opinions of Instructions ("SOI") scores from the fall 2022 semester were "unacceptable."

16. Notably, upon information and belief, Defendant has a practice or policy of utilizing SOIs in evaluating a professor's performance and making employment decisions, including but not limited to, determination of pay increases, tenure, and promotion. These SOIs are (unsurprisingly) conducted solely by students—an overwhelming amount of which are Caucasian. More specifically, during the relevant time period, approximately 71.5% of students were Caucasian, while a mere 11.6% were Black. In Dr. Harris' specific classes, the percentage of Black students was even more scant, at approximately less than 10%. Consequently, by utilizing SOIs in making employment decisions, this practice or policy of Defendant essentially delegates promotion, evaluation, compensation, and tenure decisions to a majority-Caucasian group, who are permitted to make subjective employment critiques without any guidance or oversight. This allows the students to discriminate against Black professors, whether consciously or unconsciously, and this disparately impacts Black professors in the form of stripping of roles, lower evaluations, promotion denial, tenure denial, and employment future, among other things.[1] Defendant ratified this form of discrimination, by utilizing the SOIs to make adverse employment decisions regarding Black professors, such as Dr. Harris.

17. Griffin then informed Dr. Harris that, because of the low SOI scores, she was essentially being placed on an improvement plan and forced to take an online teaching course. Dr. Harris immediately felt that this adverse action was not only retaliatory due to her engagement in protected activity, but also essentially a set-up for failure.

---

[1] *See, e.g.,* Roger W. Reinsch, Sonia M. Goltz, & Amy B. Hietapelto, Student Evaluations and the Problem of Implicit Bias, 45 Journal of College & University Law 144 (2020).

18. In or near March, 2023, Dr. Harris was not allowed to teach summer courses—despite having successfully done so regularly in the past. This was especially detrimental to Dr. Harris because she would be without income for three (3) months. When Dr. Harris inquired about this to Griffin, he merely said that summer courses were not part of her contract. However, Dr. Harris knew that this was untrue, as she had been teaching summer courses with no issues prior to Griffin taking over. Notably, Griffin did not materially reduce the compensation of Dr. Harris' similarly situated counterparts outside of her protected classes.

19. Following this exchange, Dr. Harris emailed Griffin an article that expressed the concerns she had relayed to him on the basis that using anonymous student reviews in her performance evaluations had a more adverse effect on Black employees as opposed to white employees. (*See* Paragraph 16, *supra*). Despite Dr. Harris sending Griffin clear proof which substantiated her concerns, Griffin failed to respond and, instead, allowed the discriminatory reviews and comments against Dr. Harris to remain. Dr. Harris also explained to Griffin that she had witnessed multiple Black colleagues leave the university at much higher pace than their white counterparts due to feeling unfairly treated. Griffin claimed that he would be available to discuss Dr. Harris' concerns—however, once she told him that she felt his leadership decisions concerning her employment were discriminatory, retaliatory, and acts of institutional violence towards her job, Griffin immediately ceased all communication with her. Instead, Dr. Harris was directed to speak with Senior Associate Dean Damion Waymer ("Waymer").

20. Waymer essentially doubled down on Griffin's position without meeting or talking to Dr. Harris, rather summarily stating in an email his subjective, personal belief that he did not feel that discrimination existed. As such, Dr. Harris made an appointment to meet with the new Dean of the College of Communication and Information Sciences, Brian Butler ("Butler"). Dr.

Harris shared her concerns with Butler, who promised her that he would work out a plan so that she would not lose the anticipated pay for the summer classes. However, that never happened. A few days later, Butler sent an email asking Dr. Harris to consider applying for a newly created position titled, "Assistant Dean of Professional Development and Community" based on Dr. Harris' background and training. Notably however, no action was taken to correct the rampant disparate treatment Dr. Harris had regularly complained about. Instead, Dr. Harris was offered the opportunity to apply for the position as a thinly veiled attempt to pacify her in hope that she would stop complaining.

21.    In or near April, 2023, Dr. Harris applied for the new assistant dean position—for which she was qualified. Following her application, Butler reached out to Dr. Harris and acknowledged her complaints of disparate treatment and that he believed others had contacted her with next steps. Dr. Harris immediately let Butler know that she had not received any reason for the discriminatory actions taken against her. Butler than informed Dr. Harris that he would "recontact relevant individuals" and see that they would reach out to her. Unfortunately, that never occurred.

22.    In or near May, 2023, to Dr. Harris' shock and dismay, she learned that Griffin had given her the lowest performance evaluations since she was hired in 2016—the bases of which were her SOI scores, which Dr. Harris felt were biased against her because of her identity as a Black female. Plaintiff addressed her concerns for each of Griffin's comments, explaining how she felt they were all unwarranted, retaliatory, and discriminatory. However, yet again, no remedial action was taken.

23.    After she was given the discriminatory and retaliatory evaluation, Dr. Harris contacted Butler, again inquiring about a resolution to her summer teaching concerns, how she felt

her prior complaints were continually being ignored, and that she felt it was retaliatory in nature. After a while, Butler responded, summarily stating that he found "no evidence of improper decisions regarding your summer teaching positions." Dr. Harris immediately requested a meeting to discuss in more detail, as she needed clarification on why the summer courses were suddenly taken away from her. This was especially in light of the fact that, upon information and belief, Dr. Harris' similarly situated counterparts who were outside of her protected classes did not have courses taken from them and/or had not engaged in protected activity.

24. When Dr. Harris met with Butler, he appeared very angry and irritated, rolling his eyes every time she further engaged in protected activity by complaining of the disparate treatment she was experiencing. Butler then proceeded to insult and berate Dr. Harris, snapping that, because of her SOI scores, she was a "poor performer" and an "ineffective professor"—despite (1) clear success before Griffin took over as chair; and (2) the discriminatory effect of SOIs on Black professors. As such, Dr. Harris both subjectively and objectively believed these unjustified critiques of her work performance were clear forms of further discrimination and retaliation.

25. Following this interaction, Dr. Harris was suddenly made aware by Butler that the university was no longer searching for an assistant dean and that she would not be getting the position applied for—despite her high qualifications.

26. However, Dr. Harris later found out that two (2) new positions were created, Director of Professional Education (which was a similar position to the assistant dean position Plaintiff applied for) and an Associate Chair position in her department. Plaintiff was qualified for both positions, as she (among other factors) served as an Associate Chair at a previous institution. These positions were not advertised, rendering Plaintiff unable to apply for them, and a white female was placed in each position. Plaintiff immediately knew that this was yet another act of

discrimination and retaliation for engaging in protected activity by making multiple complaints of disparate treatment.

27. Based on the above, on November 7, 2024, Plaintiff filed her original Complaint and initiated the instant action. (Doc. 1). In that Complaint, Plaintiff expressed her "good faith, reasonable belief that her employment could be in jeopardy based on the filing of this lawsuit." (Doc. 1, ¶26). *Not even three (3) months later*, that belief came to fruition. Indeed, on or around January 27, 2025, Plaintiff was made aware that her contract would not be renewed and that she would be terminated following the conclusion of the Spring 2025 semester. Defendant *solely* based its reasoning for non-renewal on the "student feedback" which Plaintiff continued to express she felt was discriminatory in nature. However, Defendant's decision stood. Indeed, this was *yet another* act of discrimination and retaliation against Plaintiff, for no other reason than simply being a Black female who spoke out against discrimination.

## FIRST CAUSE OF ACTION
### Race Discrimination—Disparate Treatment
### under 42 U.S.C. § 2000e, et seq.

28. Plaintiff re-alleges and incorporates by reference paragraphs nos. 7-27 with the same force and effect as if fully set forth herein and further states as follows:

29. Plaintiff is an African-American woman.

30. Plaintiff has been discriminated against and treated less favorably than similarly situated Caucasian employees because of her race.

31. More specifically, despite excelling as the Program Coordinator for the Master of Arts online program, Defendant suddenly and abruptly stripped Plaintiff of her role. When she inquired as to the reason why the role was taken away from her, no legitimate reason was given. Instead, Plaintiff later found out that the role went to a lesser qualified white male.

32. Additionally, in or near March, 2023, Plaintiff was not allowed to teach summer courses—despite having successfully done so regularly in the past. This was especially detrimental to Plaintiff because she would be without income for three (3) months. When Plaintiff inquired about this to Griffin, he merely said that summer courses were not part of her contract. However, none of Plaintiff's similarly situated counterparts outside of her protected classes had courses stripped from them without justification, leaving them without a substantial part of their income.

33. Moreover, Plaintiff was not considered—nor even given the opportunity to apply for—two (2) positions that she was qualified for: Director of Professional Education (which was a similar position to the assistant dean position Plaintiff applied for); and an Associate Chair position in her department. Instead, Defendant allowed both positions to go to white females who were much less qualified than Plaintiff.

34. Defendant, through the conduct of its agents, has violated Plaintiff's rights under Title VII.

35. As a result of Defendant's actions, Plaintiff has suffered harm, including but not limited to, loss of employment opportunities, compensation and other benefits and conditions of employment. Additionally, Plaintiff has suffered injury including stress, humiliation, embarrassment, inconvenience, mental anguish and suffering, and loss of enjoyment of life.

**SECOND CAUSE OF ACTION**
**Race Discrimination—Disparate Impact**
**under 42 U.S.C. § 2000e, et seq.**

36. Plaintiff re-alleges and incorporates by reference paragraph nos. 7-27 with the same force and effect as if fully set forth herein and further states as follows:

37. Plaintiff is an African-American female.

38. Upon information and belief, Defendant has a facially neutral-employment practice or policy of utilizing SOIs in evaluating a professor's performance and making employment decisions, including but not limited to, determination of pay increases, tenure, role removal, and promotion.

39. As the name suggests, SOIs are conducted solely by students—an overwhelming amount of which are Caucasian. More specifically, during the relevant time period, approximately 71.5% of students were Caucasian, while a mere 11.6% were Black. In Plaintiff's specific classes, the percentage of Black students was even more scant, at approximately less than 10%. In other words, there exists a significant statistical disparity among members of different racial groups (Caucasian and African-American/Black).

40. By utilizing SOIs in making employment decisions, this practice or policy of Defendant essentially delegates promotion, evaluation, compensation, and tenure decisions to a majority-Caucasian group, who are permitted to make subjective decisions without any guidance or oversight. This allows the students to discriminate against Black professors, whether consciously or unconsciously, and this disparately impacts Black professors in the form of stripping of roles, lower evaluations, promotion denial, tenure denial, and employment future, among other things. Defendant ratified this form of discrimination, by utilizing the SOIs to make adverse employment decisions regarding Black professors, such as Dr. Harris.

41. Defendant, through the conduct of its agents, has violated Plaintiff's rights under Title VII.

42. As a direct and proximate result of this policy or practice, Plaintiff was stripped of her role as Program Coordinator, removed from the Graduate Committee, had her compensation materially reduced by way of having summer courses taken from her, was denied positions for

which she was qualified, and was ultimately terminated. Moreover, because of Defendant's actions, Plaintiff has suffered harm, including but not limited to, loss of employment opportunities, compensation and other benefits and conditions of employment. Additionally, Plaintiff has suffered injury including stress, humiliation, embarrassment, inconvenience, mental anguish and suffering, and loss of enjoyment of life.

### THIRD CAUSE OF ACTION
### Retaliation
### under 42 U.S.C. § 2000e, et seq.

43. Plaintiff re-alleges and incorporates by reference paragraph nos. 7-27 with the same force and effect as if fully set forth herein and further states as follows:

44. Plaintiff began both witnessing and experiencing what she perceived as racial disparate treatment shortly after Griffin took over as chair in her department. More specifically, Plaintiff was stripped of roles she excelled in and courses that provided her income, with no justification. Moreover, Plaintiff was denied the ability to even apply for jobs she was qualified for—instead, the jobs went to lesser qualified white individuals under the age of forty (40). Despite Plaintiff's multiple complaints of the disparate treatment, no remedial action was ever taken.

45. Instead, following each instance of complaining about discrimination, Plaintiff suffered an adverse action as a result. More specifically, following the first instance where she complained to Griffin that she felt his stripping of her role as Program Coordinator for the Master of Arts online program was discriminatory, Plaintiff was stripped of the ability to teach summer courses, which significantly decreased her income. After her complaints related to that discriminatory act, Plaintiff was then berated and ultimately denied promotions to two (2) jobs she was well qualified for.

46. Finally, not even three (3) months after she initiated the instant action (wherein she explicitly stated her concern that "her employment could be in jeopardy based on the filing of this lawsuit[,]" (doc. 1, ¶26), Defendant terminated Plaintiff's employment, as a result of her engagements in protected activity.

47. Defendant, through the conduct of its agents, has violated Plaintiff's rights under Title VII.

48. As a result of Defendant's actions, Plaintiff has suffered harm, including but not limited to, loss of employment opportunities, compensation and other benefits and conditions of employment. Additionally, Plaintiff has suffered injury including stress, humiliation, embarrassment, inconvenience, mental anguish and suffering, and loss of enjoyment of life.

### FOURTH CAUSE OF ACTION
### Gender Discrimination—Disparate Treatment
### under 42 U.S.C. § 2000e, et seq.

49. Plaintiff re-alleges and incorporates by reference paragraph nos. 7-27 with the same force and effect as if fully set forth herein and further states as follows:

50. Plaintiff is an African-American woman.

51. Plaintiff has been discriminated against and treated less favorably than similarly situated male employees because of her gender.

52. More specifically, despite excelling as the Program Coordinator for the Master of Arts online program, Defendant suddenly and abruptly stripped Plaintiff of her role. When she inquired as to the reason why the role was taken away from her, no legitimate reason was given. Instead, Plaintiff later found out that the role went to a lesser qualified white male under the age of forty (40).

53. Additionally, in or near March, 2023, Plaintiff was not allowed to teach summer courses—despite having successfully done so regularly in the past. This was especially detrimental to Plaintiff because she would be without income for three (3) months. When Plaintiff inquired about this to Griffin, he merely said that summer courses were not part of her contract. However, none of Plaintiff's similarly situated counterparts outside of her protected classes had courses stripped from them without justification, leaving them without a substantial part of their income.

54. Defendant, through the conduct of its agents, has violated Plaintiff's rights under Title VII.

55. As a result of Defendant's actions, Plaintiff has suffered harm, including but not limited to, loss of employment opportunities, compensation and other benefits and conditions of employment. Additionally, Plaintiff has suffered injury including stress, humiliation, embarrassment, inconvenience, mental anguish and suffering, and loss of enjoyment of life.

## FIFTH CAUSE OF ACTION
### Retaliation
### under 42 U.S.C. § 2000e, et seq.

56. Plaintiff re-alleges and incorporates by reference paragraph nos. 7-27 with the same force and effect as if fully set forth herein and further states as follows:

57. Plaintiff began both witnessing and experiencing what she perceived as disparate treatment based on her gender shortly after Griffin took over as chair in her department. More specifically, Plaintiff was stripped of roles she excelled in and courses that provided her income, with no justification. Moreover, Plaintiff was denied the ability to even apply for jobs she was qualified for—instead, the jobs went to lesser qualified male individuals under the age of forty (40). Despite Plaintiff's multiple complaints of the disparate treatment, no remedial action was ever taken.

58. Instead, following each instance of complaining about discrimination, Plaintiff suffered an adverse action as a result. More specifically, following the first instance where she complained to Griffin that she felt his stripping of her role as Program Coordinator for the Master of Arts online program was discriminatory, Plaintiff was stripped of the ability to teach summer courses, which significantly decreased her income. After her complaints related to that discriminatory act, Plaintiff was then berated and ultimately denied promotions to two (2) jobs she was well qualified for.

59. Finally, not even three (3) months after she initiated the instant action (wherein she explicitly stated her concern that "her employment could be in jeopardy based on the filing of this lawsuit[,]" (doc. 1, ¶26), Defendant terminated Plaintiff's employment as a result of her engagements in protected activity.

60. Defendant, through the conduct of its agents, has violated Plaintiff's rights under Title VII.

61. As a result of Defendant's actions, Plaintiff has suffered harm, including but not limited to, loss of employment opportunities, compensation and other benefits and conditions of employment. Additionally, Plaintiff has suffered injury including stress, humiliation, embarrassment, inconvenience, mental anguish and suffering, and loss of enjoyment of life.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays this Court will assume jurisdiction of this action and, after trial, provide relief as follows:

1. Issue a declaratory judgment that the employment practices, policies, procedures, conditions and customs that led to the retaliation by Defendant are violative of the rights of Plaintiff

as secured by Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended, 42 U.S.C. § 2000e, et seq., the Civil Rights Act of 1991.

2. Grant Plaintiff a permanent injunction enjoining Defendant, its respective agents, successors, employees, attorneys and those acting in concert with Defendant and at Defendant's request from continuing to violate Title VII of the Act of Congress known as the "Civil Rights Act of 1964," as amended," 42 U.S.C. § 2000e, et seq., the Civil Rights Act of 1991.

3. Enter an Order requiring Defendant to make Plaintiff whole by awarding Plaintiff back pay (plus interest), reinstatement or front pay in lieu thereof, compensation for loss of wages and benefits, lost seniority, and pension benefits and nominal, compensatory and punitive damages.

4. Plaintiff further prays for such other and further relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees, and expenses incurred by this litigation.

5. Plaintiff has no plain, adequate, or complete remedy at law to redress the wrongs alleged in this suit, and this action for injunctive, declaratory and other relief, is the only means of securing adequate relief.

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY
ON ALL ISSUES TRIABLE BY JURY**

Respectfully submitted,

*/s/Nicki L. Lawsen*
Sidney Jackson
Samuel Fisher
Nicki L. Lawsen
*Attorneys for the Plaintiff*
**Wiggins, Childs, Pantazis, Fisher
& Goldfarb, LLC**
The Kress Building
301 Nineteenth Street North

Birmingham, Alabama 35203
sjackson@wigginschilds.com
sf@wigginschilds.com
nlawsen@wigginschilds.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 3rd day of April, 2025, I have served a true and correct copy of the foregoing via the Court's CM/ECF filing system upon the following counsel of record:

Shannon Miller
Daniel Harris
JACKSON LEWIS P.C.
800 Shades Creek Parkway
Suite 870
Birmingham, Alabama 35209
(205) 332-3105
Shannon.Miller@jacksonlewis.com
Daniel.Harris@jacksonlewis.com

                                              */s/Nicki L. Lawsen*
                                              OF COUNSEL